UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY DALE FARLEY, | No. C 13-2882 SI (pr) |
| Plaintiff, | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| V. RASO; et al., | |
| Defendants. | |

## INTRODUCTION

Anthony Dale Farley filed this *pro se* civil rights action under 42 U.S.C. § 1983, complaining about the medical treatment he received at Correctional Training Facility ("CTF") and California State Prison - Solano ("CSP-Solano"). Defendants now move for summary judgment on Farley's claims. Farley has filed an opposition, and defendants have filed a reply. For the reasons discussed below, the motion will be granted and judgment entered in defendants' favor.

## BACKGROUND

The following facts are undisputed unless otherwise noted:

On March 6, 2012, Farley had a diagnostic ultrasound of his abdomen. Docket # 1-2 at 25. The exam indicated that Farley had tense abdominal ascites and problems breathing. *Id.* While at Mercy Hospital of Bakersfield, a dietician noted that Farley was at nutritional risk because he had low platelets and had end stage liver disease. *Id.* at 30. Prior to Farley's transfer to CTF, Farley was diagnosed with End Stage Liver Disease ("ESLD") with cirrhosis. Javate Decl. at ¶ 9.

Defendant V. Raso was the Chief Deputy Warden of CTF. Defendant Dr. Javate was a medical doctor at CTF. Defendant Dr. Molina was a medical doctor at CTF. Defendant Dr. Bright was the Chief Medical Executive. Defendant G. Ellis was the Chief Executive Officer of the Prison Health Care Services at CTF. Defendant Dr. McAlpine was a medical doctor of the Prison Health Care Services at CTF. Defendant G. Swarthout was the Warden of CSP-Solano, and defendant J. Jow was a registered dietician at CSP-Solano.

On June 14, 2012, Dr. Javate prescribed Farley a therapeutic diet, i.e., hepatic diet. Docket # 1-1 at 7. A hepatic diet "is used to help promote and maintain nitrogen balance and to promote liver regeneration while preventing exacerbation of the metabolic derangements commonly found in liver disease." Molina Decl., AGO-MED 176. During that visit, Farley showed Dr. Javate that Farley was spitting, coughing, and vomiting blood from his mouth. Docket # 1-1 at 7. Blood was also coming from Farley's rectum. *Id.* Dr. Javate looked Farley's mouth and told plaintiff that the blood may be from loose teeth. Opp. at 7. Farley's vital signs were at acceptable levels, and Dr. Javate did not find any indication of internal bleeding. Javate Decl. at ¶ 7. Dr. Javate ordered that Farley obtain an EGD[1] due to internal bleeding of the esophageal varices. Docket # 1-1 at 8. Dr. Javate did not find that an emergency EGD was warranted. Javate Decl. at ¶ 7. Instead, Dr. Javate counseled Farley about avoiding foods high in sodium, and began the process of transferring Farley to a prison that had a nutritionist and could provide a higher level of care. *Id.* Dr. Javate believed that a dietician would be beneficial for Farley to provide additional nutritional information. *Id.* That same day, Dr. Bright approved the request for a hepatic diet and EGD. Docket # 1-1 at 8.

On June 21, 2012, and June 22, 2012, Farley filled out a sick call slip because he was having abdomen pain, bleeding of the esophageal varices and had not received the prescribed hepatic diet. *Id.* The sick call slips were not answered. *Id.* Farley believed that he was ingesting his own blood. *Id.*

---

[1] An EGD is also known as an esophagogastroduodenoscopy, which is a diagnostic endoscopic procedure that visualizes the upper part of the gastrointestinal tract up to the duodenum. Molina Decl. at ¶ 19.

2

On June 23, 2012, Farley was admitted to Natividad Medical Center for diarrhea and green stools. Opp. at 11. On June 25, 2012, Farley was discharged with a diagnosis of diarrhea and cirrhosis with portal hypertension. *Id.*; Maiorino Decl, AGO-MED 032. On June 27, 2012, Dr. Javate examined Farley upon his return to CTF, and affirmed that Farley's vital signs were still at acceptable levels, and there was no medical evidence of internal bleeding. Javate Decl. at ¶ 8. Farley's hemoglobin laboratory test results on June 22, 2012, were substantially similar to Farley's hemoglobin laboratory test results on May 18, 2012. *Id.* Dr. Javate submitted another request for an EGD, but based on the examination results, concluded there was no need for an emergency EGD. *Id.*

On July 2, 2012, Farley filled out another sick call slip with complaints of abdomen pain and not receiving the hepatic diet. Docket # 1-1 at 8-9. On July 11, 2012, Farley saw Dr. Molina. Molina Decl. at ¶ 7. Dr. Molina observed that, although Farley reported that his pain was a 9 or 10, on a scale of 1 to 10, Farley's abdominal exam was basically benign and soft, with normal bowel sounds. *Id.* Dr. Molina found that Farley exhibited no objective signs of acute pain, and noticed that Farley conversed comfortably and moved without difficulty. *Id.* Dr. Molina prescribed medication for treatment of chronic pain. *Id.* Dr. Molina ordered an abdominal ultrasound and EGD. *Id.* at ¶¶ 9, 11; Docket # 1-1 at 9. Dr. Molina felt that an ultrasound would determine whether Farley's abdominal pain was caused by a tumor or ascites.[2] Molina Decl. at ¶ 9. Dr. Bright approved and granted the request. Docket # 1-1 at 9.

On July 23, 2012, Dr. Molina examined Farley for abdominal pain. Opp. at 12; Molina Decl. at ¶ 11. Dr. Molina did not have the ultrasound results yet, and because Farley was showing increased weight and swelling, Dr. Molina was concerned that Farley may have increased abdominal pressure from ascites which could be relieved by paracentesis. *Id.* Therefore, Dr. Molina referred Farley to Natividad Medical Center Emergency Room for evaluation. *Id.* At the emergency room, Farley's ultrasound showed no fluid buildup or ascites *Id.*; Opp. at 12. Farley was prescribed diuretics. *Id.*; Molina Decl. at ¶ 11. On July 24, 2012,

---

[2] "Ascites is a gastroenterological term of an accumulation of fluid in the peritoneal cavity most commonly due to cirrhosis, severe liver disease or metastatic cancer." Molina Decl. at ¶ 10.

3

Dr. Molina increased the diuretics, recommended Farley for a transfer to a different prison that could accommodate a hepatic diet, and requested a nutritional consultation. *Id.* at ¶ 12; Opp. at 12.

That same day, Chief Deputy Warden V. Raso issued a modification order directing that Farley be rehoused in the central infirmary immediately. Docket # 1-1 at 9. This order was based on the fact that plaintiff was prescribed a hepatic diet. *Id.* The order stated that plaintiff shall be accommodated with the proper diet while housed at CTF in the infirmary until Farley was transferred to another institution. *Id.* These orders were not followed. *Id.* Instead, Dr. Bright, the "Chief Medical Executive" of CTF, completed the modification by requesting the medical services that Farley first have a consultation with a certified dietician. *Id.* at 35. Further, the accommodation for housing was modified pursuant to Dr. Bright's orders that Farley could remain at CTF-South pending the consultation. *Id.* Farley was to be taken back to classification for possible transfer to CSP-Soledad. *Id.*

On July 27, 2012, Farley's administrative appeal at the second level of review was granted in part and denied in part. *Id.* at 23-24. The response explained that Farley was not yet given a hepatic diet because the prison was not equipped to prepare such a diet. *Id.* at 23. The response also acknowledged that Dr. Javate had ordered that Farley be placed on a hepatic diet, which was low protein and low sodium. *Id.* However, Farley had not yet completed a follow up consultation with a nutritionist or dietician. *Id.* After the prison discovered that Farley had not received a consultation, Dr. Bright initiated the order for Farley to receive a consultation as well as to transfer Farley to CSP-Solano as soon as possible so that Farley could receive his special medical diet. *Id.* Dr. Bright also concluded that Farley was healthy enough to receive a non-hepatic diet until his transfer on August 1, 2012. *Id.*

On August 1, 2012, Farley was received at CSP-Solano. Maiorino Decl., AGO-MED 079-080. On August 6, 2012, Farley was seen by a medical doctor at CSP-Solano, who noted that Farley seemed more interested in receiving pain medication than in his liver disease. *Id.* at AGO-MED 081.

On August 16, 2012, after receiving an inquiry from the Prison Law Office, the Chief

4

Medical Executive ("CME") at CSP-Solano indicated that there had been some confusion regarding Farley's prescribed diet, and Farley was not yet receiving a hepatic diet because he had not yet been seen by the institution's Registered Dietician, J. Jow. Docket # 1-2 at 10. The CME also noted that while CSP-Solano does have a hepatic diet available for outpatients, a transfer patient does not automatically receive such a diet unless the treating doctor and a nutritionist agree that the inmate needs it. *Id.* Oftentimes, inmates with ESLD are able to manage a diet based on the current "Heart Healthy" diet that is provided to all inmates. *Id.* The registered dietician, J. Jow, briefly reviewed Farley's medical notes from CTF as well as the more recent notes from CSP-Solano, which showed that Farley's sodium, potassium, blood urea nitrogen, and creatinine levels were all within normal limits as of July 27, 2012. *Id.* Farley's albumin on May 18, 2012, was also within normal limits. *Id.* The Heart Healthy diet is considered low fat and low sodium. *Id.* at 11.

On August 20, 2012, Jow interviewed Farley at CSP-Solano, and approved a nutrition drink called Boost. Docket # 1-2 at 34. Jow labeled it a hepatic diet supplement. Docket # 1-1 at 10. Jow also said that the regularly served meals are "Heart Healthy diets" and that they were sufficient for Farley's condition. *Id.*

On August 31, 2012, Farley alleges that he was sent to a hospital in Manteca for emergency surgery as a result of banding and 5 bleeding holes in his esophogus because of his liver disease and cirrhosis to the liver. Docket # 1-1 at 10. However, medical notes from Dr. Tran, who tended to Farley that day, indicated that Farley's visit was for a consultation and EGD. Maiorino Decl., AGO-MED 092-093. Dr. Tran assessed that Farley suffered from Hepatitis C liver cirrhosis and esophageal varices and recommended that Farley continue with supportive care, maintain a 2 gram sodium diet, and continue with medication. *Id.*, AGO MED 093.

On October 12, 2012, Farley's administrative appeal at the Director's level of review was denied. Docket # 1-1 at 21-22. The response concluded that the CME at CTF stated that Farley was healthy enough to continue on the non-hepatic diet until he was transferred to CSP-Solano. *Id.* Farley had been tolerating a Heart Healthy diet and was in good condition. *Id.*

5

## VENUE AND JURISDICTION

Venue is proper in the Northern District of California because some of the events or omissions giving rise to the claim occurred in Monterey County, which is located within the Northern District. *See* 28 U.S.C. §§ 84, 1391(b). This court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Farley's complaint and opposition are verified and therefore may be considered as evidence.

The court's function on a summary judgment motion is not to make credibility

determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631.

## DISCUSSION

A. <u>The Motion For Summary Judgment</u>

Deliberate indifference to a prisoner's serious medical needs amounts to the cruel and unusual punishment prohibited by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Farley's claims arise under the Eighth Amendment's Cruel and Unusual Punishments Clause rather than the Fourteen Amendment's Due Process Clause because he was in custody serving a sentence on a criminal conviction at all relevant times. *See Bell v. Wolfish*, 441 U.S. 520, 536 & n.16 (1979); *Carnell v. Grimm*, 74 F.3d 977, 979 (9th Cir. 1996).

A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Accordingly, evaluating a claim of deliberate indifference necessitates examining "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds, WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Id.* (quoting *Estelle*, 429 U.S. at 104). A prison official exhibits deliberate indifference when he or she knows of and disregards a substantial risk of serious harm to inmate health. *See Farmer*, 511 U.S. at 837. The official must both know of "facts from which the inference could be drawn" that an excessive risk of harm exists, and he or she must actually draw that inference. *Id.*

Farley claims that between June 14, 2012, and November 5, 2012, defendants improperly

7

denied and delayed a hepatic diet and an EGD. Opp. at 3. Farley further asserts that the Heart Healthy diet is high in sodium and protein, and as a result of the Heart Healthy diet, Farley suffered great pain to his abdomen, stomach, liver, and esophagus. *Id.* at 4. Farley goes on to say that the high sodium in the Heart Healthy diet created several issues, including gastrointestinal bleeding, which Farley claims would have been prevented had Farley received the prescribed hepatic diet. *Id.*

### 1. Denial of a hepatic diet

Farley fails to show a triable issue of fact in support of his claim that CTF doctors were deliberately indifferent to his serious medical needs concerning the denial or delay of a hepatic diet. First, the evidence is undisputed that Dr. Javate recommended a hepatic diet for Farley at his first visit on June 14, 2012. Javate Decl. at ¶ 7. In the meantime, Dr. Javate counseled Farley about his diet, and advised Farley to avoid high-sodium foods. *Id.* Dr. Javate also completed the paperwork to have Farley transferred to a medical institution that had a dietician as well as special medical diets. *Id.* On July 11, 2012, Dr. Molina also recommended a hepatic diet for Farley, and ordered an abdomen ultrasound and EGD. Docket # 1-1 at 9. On July 22, 2012, medical tests showed that Farley had no ascites and did not have significant fluid build-up. Molina Decl. at ¶ 11. On July 24, 2012, Dr. Molina submitted a request for Farley to receive a hepatic diet and a nutritional consultation, and completed the paperwork to transfer Farley to an institution better suited to care for Farley's needs. *Id.* On July 27, 2012, the prison's response to Farley's administrative appeal explained that because CTF was not equipped to offer a hepatic diet, Farley was to be transferred to CSP-Solano, which was staffed by a dietician and had the means to provide a hepatic diet. Docket # 1-1 at 23. On August 1, 2012, Farley was transferred to CSP-Solano.

Deliberate indifference may be demonstrated when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown in the way in which prison officials provide medical care. *See McGuckin*, 974 F.2d at 1062. Here, there is an absence of evidence that either Dr. Javate or Dr. Molina was the cause of the denial or delay of Farley's

8

receipt of a hepatic diet. Both doctors recommended a hepatic diet and a consultation with a nutritionist for Farley. Neither the hepatic diet nor a nutritionist were available at CTF. Thus both doctors requested that Farley be transferred to an institution where he could be provided with both a nutritionist consultation and a hepatic diet. Nonetheless, the purpose of a hepatic diet was to reduce Farley's ascites, which was being controlled with diuretics. Molina Decl. at ¶ 16; Javate Decl. at ¶ 10. During the months of June and July 2012, the evidence is undisputed that Farley's objective medical tests as related to his diet showed that Farley was clinically stable and there was no sign of acute internal bleeding. Molina Decl. at ¶ 16; Javate Decl. at ¶ 10. There is an absence of evidence that Dr. Javate or Dr. Molina purposefully acted or failed to act to obtain a hepatic diet for Farley, or that those actions caused Farley any harm. Based on the absence of a genuine issue of disputed material fact regarding whether Dr. Javate or Dr. Molina exhibited a deliberate indifference to Farley's receipt of a hepatic diet, defendants' motion for summary judgment as to Dr. Javate and Dr. Molina is GRANTED.

Regarding Chief Deputy Warden Raso, Farley claims that Raso failed to follow-up with Raso's own order, dated July 24, 2012, that Farley be housed in the Central Infirmary and accommodated with a hepatic diet until Farley's transfer. Opp. at 19. However, the evidence is undisputed that on July 24, 2012, Farley returned from Natividad Medical Center and told Dr. Molina that he preferred to stay in general population rather than the Outpatient Housing Unit, which had a twenty-four hour nursing staff. Molina Decl. at ¶ 12. Farley was transferred to CSP-Solano less than one week later, on August 1, 2012. There is no indication that Raso was aware that Farley remained in general population, nor is there any evidence that Farley suffered any resulting harm from the failure to be rehoused. Based on the record, there is an absence of evidence that Raso was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," much less drew an inference. *Farmer*, 511 U.S. at 837; *McGuckin*, 974 F.2d at 1060. Accordingly, defendants' motion for summary judgment as to Chief Deputy Warden Raso is GRANTED.

Farley also fails to show a triable issue of fact in support of his claim that CSP-Solano defendants were deliberately indifferent to his serious medical needs concerning the denial of

9

a hepatic diet. The evidence demonstrates that, initially, Farley was not yet receiving a hepatic diet because he was waiting to be seen by Jow. Docket # 1-2 at 10. Generally, a transfer patient does not automatically receive a hepatic diet unless the treating doctor and a nutritionist agree that the inmate needs it. *Id.* Oftentimes, inmates with ESLD are able to manage a diet based on the current "Heart Healthy" diet that is provided to all inmates. *Id.* Jow briefly reviewed Farley's medical notes from CTF, as well as the more recent notes from CSP-Solano, which showed that Farley's sodium, potassium, blood urea nitrogen, and creatinine levels were all within normal limits as of July 27, 2012. *Id.* Farley's albumin on May 18, 2012, was also within normal limits. *Id.*

Although Farley insists that he suffered esophageal bleeding which was caused by an improper diet, i.e., non-hepatic diet, he submits no evidence supporting his statement. Opp. at 17. Farley alleges that, on August 31, 2012, he received emergency surgery as a result of five bleeding holes to his esophogus because of his liver disease and cirrhosis to the liver. Docket # 1-1 at 10. Farley asserts that the denial of the hepatic diet caused this emergency visit because the regularly served food was too high in sodium for his condition as he was supposed to be on a diet that limited his sodium to two grams per day. *Id.* at 10-11; Opp. at 12-13.

However, defendants provide documents from non-defendant Dr. Tran, dated August 31, 2012, which indicate that Farley had a consultation and an EGD – not an emergency visit. Maiorino Decl., AGO MED 092-093. At that consultation, Dr. Tran noted that Farley had a history of hepatitis C, liver cirrhosis, esophageal varices, and had previous banding surgery. *Id.*, AGO MED 092. Thereafter, Dr. Tran performed an EGD and placed five bands on Farley's varices. Maiorino Decl., AGO MED 089. Dr. Tran's notes do not indicate that Farley was suffering from any active esophageal bleeding, or that the consultation was an emergency. Javate Decl. at ¶ 9. Rather, the evidence shows that the consultation was in response to Dr. Javate's June 27, 2012, request for an EGD. *Id.*

Although there may be some factual dispute between the parties as to the existence of active esophageal bleeding during this period, there is an absence of evidence supporting Farley's contention that any bleeding was caused or exacerbated by an improper diet, or that he

10

1  received emergency surgery on that date. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When
2  opposing parties tell two different stories, one of which is blatantly contradicted by the record,
3  so that no reasonable jury could believe it, a court should not adopt that version of the facts for
4  purposes of ruling on a motion for summary judgment."); *see also Celotex Corp.*, 477 U.S. at
5  322 (summary judgment should be entered, after adequate time for discovery and upon motion,
6  against a party who fails to make a showing sufficient to establish the existence of an element
7  essential to that party's case, and on which that party will bear the burden of proof at trial);
8  *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000) ("A scintilla of evidence or
9  evidence that is merely colorable . . . does not present a genuine issue of material fact" but rather
10 there "must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat
11 the summary judgment motion.").

12 Farley also urges the court to credit his assertion that the Heart Healthy diet was high in
13 sodium and protein, which caused him to suffer unnecessarily, and which would have been
14 prevented had he received the hepatic diet. However, again, Farley does not provide any support
15 for his allegation that the diet and accompanying instructions provided to him at CSP-Solano
16 caused any harm or that Jow was deliberately indifferent in denying Farley a hepatic diet. Both
17 the Heart Healthy diet and the hepatic diets contain 2600-2800 calories. Jow Decl., AGO-MED
18 126-27. While the hepatic diet is limited to 2-3 grams of sodium, the Heart Healthy diet's
19 maximum sodium level is 3-4 grams.[3] *Id.* Jow met with Farley on August 16, 2012, and
20 provided Farley with information concerning his need to avoid salty foods including sausages,
21 lunch meats, hot dogs, condiments, and other foods high in sodium. Jow Decl. at ¶ 8; Maiorino
22 Decl., AGO-MED 085. Jow further recommended that Farley continue the liquid nutritional
23 supplement, "Boost," up to three times a week. Jow Decl. at ¶ 8. On September 6, 2012, Jow
24 met with Farley again, and noted that Farley's weight remained stable as it was two pounds more
25 than it was on August 16. Maiorino Decl., AGO-MED 103. The purpose of a hepatic diet is to
26 reduce ascites, which, at the time Farley entered CSP-Solano, was well controlled with diuretics.

---

[3] Jow's statement to the contrary that the "Heart Healthy Diet is the same diet as the Low Sodium Diet identified in the manual" is unpersuasive. Jow Decl. at ¶ 8.

11

1  Molina Decl. at ¶¶ 12, 16; Javate Decl. at ¶ 10.  Further, Farley had undergone at least three
2  separate ultrasound procedures, each of which confirmed that he had no ascites.  Molina Decl.
3  at ¶ 12; Javate Decl. at ¶ 10.  In addition, the California Prison Health Services manual states that
4  a hepatic diet is indicated for inmates "with end stage liver disease complicated by ascites
5  requiring paracentesis and/or a prior history of encephalopathy requiring hospitalization."  Jow
6  Decl., AGO-MED 213.  There is no evidence that Farley has experienced either specific
7  scenario.  It appears that Farley had a difference of opinion as to whether he should have been
8  given the hepatic diet.  However, a difference of opinion, without more, is insufficient to
9  establish deliberate indifference.  *See Toguchi v. Chung*, 391 F.3d 1051, 1058-60 (9th Cir. 2004).
10 Here, Farley has failed to demonstrate that the diet with dietary instructions that Jow chose was
11 medically unacceptable under the circumstances and that Jow chose this course in conscious
12 disregard of an excessive risk to Farley's health.  *Id.* at 1058.  Rather, the evidence is undisputed
13 that the dietary decisions made by Jow complied with the applicable standard of care.
14 Accordingly, defendants' motion for summary judgment as to Jow is GRANTED.

### 2. Delay of EGD

Farley argues that defendants improperly delayed the August 31, 2012 EGD procedure. However, there is no evidence that CTF defendants were deliberately indifferent in their failure to request an emergency EGD.  The undisputed evidence shows that at Farley's first visit with Dr. Javate in June 2012, there was no objective medical evidence of internal bleeding, which led Dr. Javate to conclude that there was no need for an emergent EGD.  Javate Decl. at ¶ 7.  In the meantime, Dr. Javate began the process for transferring Farley to an institution that had a dietician on staff, and was equipped to provide a higher level of medical care.  *Id.*  Nearly two weeks later, Dr. Javate saw Farley when Farley returned from Natividad Medical Center after having been diagnosed with diarrhea and cirrhosis with portal hypertension.  Opp. at 11; Maiorino Decl., AGO-MED 032.  On that date, the medical evidence is undisputed that Farley's vital signs were still at acceptable levels and there continued to be no medical evidence of internal bleeding or need for an emergent EGD.  Javate Decl. at ¶ 8.

1    Nonetheless, despite medical evidence to the contrary, Farley argues that Dr. Javate failed
2 to properly consider Farley's past record of bleeding esophageal varices and previous surgery
3 of banding to the esophagus. Opp. at 7. Farley further states that his previous lab results showed
4 that Farley was in the critical range for bleeding of the varices, yet Dr. Javate denied Farley an
5 emergency EGD and instead put Farley on an EGD waiting list. *Id.* Farley alleges that this
6 delay caused him to ingest his own blood, prevent his blood from flowing normally through the
7 liver, and caused even more damage to Farley's liver function. *Id.*

8    However, again, Farley has provided no evidence to support this conclusory assertion.
9 Because Farley was asymptomatic for acute bleeding while at CTF, Dr. Javate requested a non-
10 emergency EGD, which was to be completed within 90 days. Javate Decl. at ¶ 12; Molina Decl.
11 at ¶ 20. Based on guidelines from the American Association for the Study of Liver Disease, the
12 recommended EGD schedule for patients with prior bleeding, like Farley, is every three to six
13 months. Javate Decl. at ¶ 12; Molina Decl. at ¶ 20. The undisputed evidence shows that Farley
14 received an EGD within the recommended guidelines in February, March, and August 2012.
15 Javate Decl. at ¶ 12; Molina Decl. at ¶ 20. Moreover, there is an absence of evidence that the
16 two to three month delay that Farley experienced from the day that Dr. Javate examined him in
17 June, resulted in any harm. A mere difference of opinion as to whether Farley should have
18 received an EGD earlier than August 2012 is insufficient to establish deliberate indifference.
19 *See Toguchi*, 391 F.3d 1051, 1058-60 (9th Cir. 2004). Here, Farley has failed to demonstrate
20 that the course of treatment Dr. Javate and Dr. Molina chose was medically unacceptable under
21 the circumstances and that they chose this course in conscious disregard of an excessive risk to
22 Farley's health. *Id.* at 1058. Accordingly, defendants' motion for summary judgment as to Dr.
23 Javate and Dr. Molina is GRANTED.

24    Farley has also failed to raise a triable issue of fact on his claim that Ellis, Dr. Bright, and
25 Warden Swarthout was deliberately indifferent to Farley's medical needs. It is undisputed that
26 Ellis, Dr. Bright, and Swarthout did not treat Farley. Their liability would stem only from their
27 actions as supervisors. A supervisor may be liable under section 1983 upon a showing of
28 personal involvement in the constitutional deprivation or a sufficient causal connection between

13

1 the supervisor's wrongful conduct and the constitutional violation. *Redman v. County of San
2 Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc) (citation omitted). Because there were no
3 constitutional violations by the supervised defendants, Farley cannot show the necessary causal
4 connection between any of supervisors' acts or omissions as supervisor and a constitutional
5 violation. Accordingly, defendants' motion for summary judgment as to Ellis, Dr. Bright, and
6 Warden Swarthout is GRANTED.[4]

7 When the evidence is viewed in the light most favorable to Farley, and inferences
8 therefrom drawn in his favor, no reasonable jury could return a verdict for him and against
9 defendants. Defendants therefore are entitled to judgment as a matter of law on the merits of his
10 Eighth Amendment claim.[5]

### B. Motions for appointment of counsel

Farley has requested appointment of counsel. A district court has the discretion under 28 U.S.C. §1915(e)(1) to designate counsel to represent an indigent civil litigant in exceptional circumstances. *See Wilborn v. Escalderon*, 789 F.2d 1328, 1331 (9th Cir. 1986). This requires an evaluation of both the likelihood of success on the merits and the ability of the plaintiff to articulate his claims *pro se* in light of the complexity of the legal issues involved. *See id.* Neither of these factors is dispositive and both must be viewed together before deciding on a request for counsel under § 1915(e)(1). Here, exceptional circumstances requiring the

---

[4] The court notes that Dr. S. McAlpine was never properly served. However, summary judgment may be granted by the court *sua sponte* in favor of a nonappearing party on the basis of facts presented by other defendants who have appeared. *See Columbia Steel Fabricators v. Ahlstrom Recovery*, 44 F.3d 800, 802-03 (9th Cir. 1995) (affirming grant of summary judgment in favor of nonappearing defendant where plaintiff, in response to summary judgment motion filed by defendant who had appeared, had "full and fair opportunity to brief and present evidence" on dispositive issue as to claim against nonappearing defendant); *see also Abagninin v. AMVAC Chemical Corp.*, 545 F.3d 733, 742 (9th Cir. 2008) (holding district court properly granted motion for judgment on the pleadings as to unserved defendants where such defendants were in a position similar to served defendants against whom claim for relief could not be stated). Here, Dr. S. McAlpine is similarly situated to Ellis in that Farley claimed that they both worked for the Prison Health Care Services, and they both approved requests that Farley receive a hepatic diet, an abdomen ultrasound, and an EGD. Thus, Dr. S. McAlpine is entitled to summary judgment on the same basis as Ellis was granted summary judgment.

[5] Because the court is granting summary judgment on the merits, it is unnecessary to discuss defendants' alternate argument that they are entitled to qualified immunity.

appointment of counsel are not evident. The motions for appointment of counsel are DENIED.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED. (Docket # 16.) Defendants are entitled to judgment as a matter of law on the merits of Farley's claims. Judgment will be entered in all defendants' favor and against Farley.

Plaintiff's motions for appointment of counsel are DENIED.

The clerk will close the file.

IT IS SO ORDERED.

Dated: May 12, 2014

                                             SUSAN ILLSTON
                                             United States District Judge